08-4463-cv
Huppe v. WPCS Int'l, Inc.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: June 26, 2009                                    Decided: January 20, 2012)

Docket No. 08-4463-cv

_____

MAUREEN A. HUPPE,

*Plaintiff-Appellee*,

v.

WPCS INTERNATIONAL INCORPORATED,

*Defendant*,

SPECIAL SITUATIONS FUND III QP, L.P., SPECIAL SITUATIONS PRIVATE EQUITY FUND, L.P.,

*Defendants-Appellants*.

Before: JACOBS, *Chief Judge*, B.D. PARKER, *Circuit Judge*, and TSOUCALAS, *Judge*.[*]

_____

Appeal from a judgment of the United States District Court for the Southern District of New York (Swain, *J.*) in favor of Plaintiff-Appellee on claims under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b).

AFFIRMED.

_____

---

[*] The Honorable Nicholas Tsoucalas, Senior Judge of the United States Court of International Trade, sitting by designation.

DANIEL E. DOHERTY, Law Offices of Daniel E. Doherty, Overland Park, KS (DAVID LOPEZ, Law Office of David Lopez, Southhampton, NY, *on the brief*), *for Plaintiff-Appellee*.

THOMAS E. REDBURN, JR., Lowenstein Sandler P.C., New York, NY (LAWRENCE M. ROLNICK, Lowenstein Sandler P.C., New York, NY, *on the briefs*), *for Defendants-Appellants*.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Section 16(b) of the Securities Exchange Act of 1934 imposes strict liability on insiders whose purchases and sales of securities result in "short-swing profits." *See* 15 U.S.C. § 78p(b). Insiders include directors, officers, and "beneficial owners" of more than 10% of a company's registered securities – namely, persons who exercise voting or investment control over, and hold a pecuniary interest in, more than 10% of a company's registered securities. *See id.* § 78p(a)(1) and (b); 17 C.F.R. § 240.16a-1(a)(1)-(2); *id* § 240.13d-3(a)(1)-(2).

This appeal concerns whether a beneficial owner's acquisition of securities directly from an issuer – at the issuer's request and with the board's approval – should be exempt from the definition of a "purchase" under Section 16(b), on the theory that such a transaction lacks the "potential for speculative abuse" that Section 16(b) was designed to curb. *See Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 599 (1973). We hold that such transactions are covered by Section 16(b). We further hold that the Defendants-Appellants, who are limited partnerships, are beneficial owners for the purposes of Section 16(b) liability, notwithstanding

their delegation of voting and investment control over their securities portfolios to their general partners' agents. Accordingly, we affirm the judgment of the district court.[1]

## BACKGROUND

Defendants-Appellants, Special Situations Fund III QP, L.P. ("QP") and Special Situations Private Equity Fund, L.P. ("PE") (together, the "Funds") are Delaware limited partnerships. The Funds invest in publicly traded companies through so-called "PIPE" (private investment in public equity) transactions – privately negotiated acquisitions of positions in publicly traded companies. At all relevant times, each fund owned over 10% of the shares of nominal Defendant WPCS International Incorporated ("WPCS"), a wireless infrastructure engineering and special communications systems company whose shares trade on the NASDAQ.

The Funds' limited partnership agreements provide that "the management, operation and control of the business of the Fund shall be vested completely and exclusively in [a] General Partner" who "shall have the right, power and authority, on behalf of the Fund and in its name, to exercise all rights, powers and authority of a general partner under the laws of Delaware." Appendix at 60, 106. The partnership agreements further empower each general partner to invest or reinvest the limited partnership's assets, and to appoint agents to perform the general partner's duties. PE's general partner is a limited liability company of which Austin W. Marxe and David M. Greenhouse are members. QP's general partner is a limited partnership of which Marxe and Greenhouse are limited partners. Through these arrangements, Marxe and

---

[1] This decision was significantly delayed while we awaited the issuance of an opinion by another panel having priority on an issue that might have resolved both cases. *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276 (2d Cir. 2011).

Greenhouse hold the exclusive power to make all investment and voting decisions on behalf of the general partners and, in turn, on behalf of the Funds.

Beginning in December 2005 and continuing until the end of January 2006, the Funds sold WPCS shares in their portfolios on the open market at prices between $9.183 and $12.62 per share. These sales constituted the first leg of the trades for which the Funds now face disgorgement liability under Section 16(b).

In March 2006, WPCS announced that a change in applicable accounting rules required it to restate certain financial statements. WPCS's share price fell precipitously on the announcement, compromising WPCS's plans for a secondary public offering intended to raise capital for a critical strategic acquisition. At that point, WPCS approached Marxe and Greenhouse to gauge their interest in a PIPE transaction. (Marxe and Greenhouse had already closed one PIPE transaction with WPCS in November 2004 for $5 million.) They responded favorably and, on April 11, 2006, the Funds, together with other funds managed by Marxe and Greenhouse, bought 876,931 additional shares directly from WPCS at $7.00 per share – a discount of approximately 7% from the market price. WPCS's board of directors approved the transaction. WPCS used the new capital to make the acquisition, and the company's share price began to improve.

Plaintiff-Appellee Maureen A. Huppe, a WPCS shareholder, subsequently filed this derivative action alleging that the Funds, as ten percent holders, were liable to WPCS under Section 16(b) for their short swing profits – namely, the difference between the prices at which the Funds sold WPCS shares from December 2005 to January 2006, and the lower prices of the

4

April purchases. Matching these sales and purchases, Huppe sought disgorgement of approximately $486,000.

At the close of discovery, both parties moved for summary judgment. The Funds argued that, because they had delegated voting and investment power over their holdings of WPCS to Marxe and Greenhouse, only they – and not the Funds – could be held liable as "beneficial owners" for purposes of Section 16(b). The Funds further argued that, even if they were beneficial owners, the 2006 PIPE transaction should be exempt from the definition of a "purchase" under Section 16(b). Because the transaction was issuer-solicited and approved by the board, they argued, it differed from the paradigmatic abusive sale/purchase sequence that Section 16(b) was enacted to prevent. The United States District Court for the Southern District of New York (Swain, *J.*) rejected both arguments, denying the Funds' motion and granting Huppe's motion. *See Huppe ex rel. WPCS Int'l Inc. v. Special Situations Fund III QP, L.P.*, 565 F. Supp. 2d 495, 503 (S.D.N.Y. 2008). After concluding that the Funds' principal-agent relationship with Marxe and Greenhouse did not alter the Funds' insider status, the district court held that, because the Funds' April purchase was neither hostile nor involuntary, the potential for abuse that Section 16(b) was designed to curb existed, and consequently the Funds were liable for their short-swing profits. *Id.* at 500, 501. This appeal followed. We review the district court's grant of summary judgment *de novo*. *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).

**DISCUSSION**

The Funds argue that the district court erred in its determinations that the 2006 PIPE transaction was a non-exempt purchase of WPCS shares and that the Funds were "beneficial

owners" under Section 16(b). Section 16(b) provides that officers, directors, and principal shareholders of a company are liable for profits realized from the purchase and sale (or sale and purchase) of its shares within a six-month period. 15 U.S.C. § 78p(b).[2] The section was designed to prevent these insiders from engaging in speculative transactions on the basis of information not available to others. *See* S. Rep. No. 73-792, at 9 (1934). The 1934 Act defines "purchases" and "sales" broadly. *See* 15 U.S.C. § 78c(a)(13) ("The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire."); *id.* § 78c(a)(14) ("The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."). As we have observed, it is "quite apparent" that Section 16(b) may be applied not only to routine cash purchases and sales, but also to acquisitions and dispositions of equity securities in transactions such as conversions, options, stock warrants, and reclassifications. *See Blau v. Lamb*, 363 F.2d 507, 516 (2d Cir. 1966). The Funds' acquisition of stock from WPCS in April 2006 clearly falls within the literal terms of Section 16(b). *Cf. Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 124 (2d Cir. 2002) (explaining that "[w]here . . . the transaction at issue does not plainly fall within the literal terms of the statute, [t]he judicial tendency, especially in this circuit, has been

---

[2] Specifically, Section 16(b) provides that,

> [f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . .

15 U.S.C. § 78p(b).

6

to interpret Section 16(b) in ways that are most consistent with the legislative purpose") (second alteration in original) (quotation marks omitted).

Nevertheless, the Funds argue that we should exempt the April transaction from Section 16(b)'s coverage because it was the product of direct negotiations between WPCS and the Funds and approved by WPCS's board of directors.[3] Thus, they argue, even if one assumes the Funds had access to inside information about WPCS, it was impossible for the Funds to gain any speculative advantage from such information because WPCS and its board – which approved the transaction – had access to the same information.

Section 16(b) has been described as a "blunt instrument," *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998), "a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great," *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972). Significantly, no showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement. *Magma Power Co.*, 136 F.3d at 320-21. In limited circumstances, we scrutinize "borderline" or "unorthodox" transactions "pragmatic[ally]" to determine whether they serve as a "vehicle for the evil which Congress sought to prevent – the realization of short-swing profits based upon

---

[3] The Funds also argue that, because the April 2006 PIPE transaction was undertaken at WPCS's request, there was no possibility of speculative abuse. *See* Appellants' Br. 54 ("If the purchase was merely the second half of a short-swing speculative escapade, it would have taken place at the instance of Marxe and Greenhouse, rather than the Company."). However, *Roth v. Fund of Funds, Ltd.*, 405 F.2d 421 (2d Cir. 1968), forecloses this argument. *See id.* at 423 (declining defendant's invitation to create an exception to Section 16(b) liability "where the transaction giving rise to the profit occurred at the incentive of the issuer"); *see also Magida v. Continental Can Co.*, 231 F.2d 843, 846 (2d Cir. 1956) ("[W]e think that as a matter of law, the language and purpose of the statute preclude an estoppel based upon instigation by or benefit to the corporation whose shares are traded.").

7

access to inside information." *Kern Cnty.*, 411 U.S. at 593-94 & n.26; *see Steel Partners II*, 315 F.3d at 126-27; *Heublein, Inc. v. Gen. Cinema Corp.*, 722 F.2d 29, 31 (2d Cir. 1983); *Am. Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1055-56 (2d Cir. 1974); *Blau*, 363 F.2d at 518-21. However, "[t]his Circuit has suggested that . . . an [1] involuntary transaction by an insider [2] having no access to inside information . . . are prerequisites to use of the *Kern County* analysis." *At Home Corp.*, 446 F.3d at 408. Moreover, we have been clear that Section 16(b) should be applied without further inquiry if there is "at least the possibility" of speculative abuse of inside information. *See Blau*, 363 F.2d at 519.

The 2006 PIPE transaction was not a "borderline" transaction within the meaning of *Kern County* because the Funds gave WPCS a wholly volitional capital infusion and had access to inside information. Indeed, the SEC has taken the position that ten percent holders "can be presumed to have access to inside information because they can influence or control the issuer as a result of their equity ownership." Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242, 7244 (Feb. 21, 1991). Nothing about the 2006 PIPE transaction foreclosed the Funds' potential influence over WPCS. Thus, far from an "unorthodox transaction," the 2006 PIPE transaction presents at best a "novel theory of insider purchasing," which "alone does not justify resort to *Kern County*'s 'borderline transaction' framework." *At Home Corp.*, 446 F.3d at 408.

Section 16(b) provides that it shall not "be construed to cover . . . any transaction . . . which the Commission by rules and regulations may exempt as not comprehended within the purpose of [Section 16(b)]." 15 U.S.C. § 78p(b). Exercising its broad authority under the statute, the SEC promulgated Rule 16b-3(d), which exempts from Section 16(b)'s coverage

8

directors' and officers' board-approved acquisition of securities directly from issuers. *See* 17 C.F.R. § 240.16b-3. Relying on this exemption, the Funds argue that, even though they are not directors or officers, their acquisition of stock directly from WPCS via the 2006 PIPE transaction was similarly "not comprehended within the purpose" of Section 16(b).

In *Roth v. Perseus, L.L.C.*, 522 F.3d 242 (2d Cir. 2008) ("*Perseus*"), we upheld both the promulgation of Rule 16b-3(d) as within the authority granted to the SEC by Section 16(b), as well as its application to directors by deputization – *i.e.*, directors designated by beneficial owners to sit on the boards of companies whose shares they beneficially own. *See id.* at 249. We gave *Chevron* deference to the SEC's opinion that such issuer-insider transactions are "not comprehended within" the purpose of Section 16(b) because they typically lack the information asymmetry associated with market transactions between insiders and ordinary investors. *See id.* (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)). Relying principally on the legislative history of Section 16(b) cited in *Kern County*, we found that Section 16(b)'s focus on preventing insiders from taking advantage of information not available to others rendered the SEC's exemption neither arbitrary nor manifestly contrary to the statute. *Id.*; *accord Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 505 (3d Cir. 2008). Finally, we found reasonable the SEC's conclusion that the fiduciary obligations of appointed directors were sufficient to guard against any risks posed by interpreting Rule 16b-3(d) to apply to directors by deputization. *See Perseus*, 522 F.3d at 247 n.6.

Neither Rule 16b-3(d) nor *Perseus* controls our analysis here. Because the Funds are neither directors by deputization, nor officers or directors, Rule 16b-3(d) does not apply. Significantly, the SEC has expressly declined to include ten percent holders within Rule 16b-

9

3(d)'s exemption because, unlike officers and directors, they do not necessarily owe fiduciary duties to a corporation. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-37260, 61 Fed. Reg. 30376, 30378 n.42 (June 14, 1996) (1996 Adopting Release) ("Such duties, which act as an independent constraint on self-dealing, may not extend to ten percent holders. The lack of other constraints argues against making new Rule 16b-3 available to ten percent holders.").[4]

Moreover, our finding in *Perseus* that the transactions covered by Rule 16b-3(d) were properly exempted from Section 16(b) *by the SEC* – which has broad exemptive authority under the statute not shared by the courts – does not mean those transactions lack any risk of speculative abuse, such as the possible exploitation of information asymmetry. Similarly, the fact that issuers and insiders will share access to the same "inside" information in most issuer-insider transactions does not mean that *every* issuer-insider transaction is invulnerable to information asymmetry. Indeed, in its amicus brief in *Perseus*, the SEC acknowledged that

---

[4] *See also* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-36356, 60 Fed. Reg. 53832, 53833 & n.11 (Oct. 17, 1995) (1995 Proposing Release) (defending exemption of director-issuer and officer-issuer transactions from Section 16(b) liability on grounds that "traditional state law procedural protections can be useful in further ensuring compliance with the underlying purposes of Section 16 by creating effective prophylactics against possible insider trading abuses."); Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-52202, 70 Fed. Reg. 46080, 46082 (Aug. 9, 2005) ("The revisions [to Rule 16b-3(d)] focused on the distinction between market transactions by officers and directors, which present opportunities for profit based on non-public information that Section 16(b) is intended to discourage, and transactions between an issuer and its officers and directors, *which are subject to fiduciary duties under state law*.") (emphasis added); Brief of SEC, *Amicus Curiae*, in Support of Position of Appellees at 25, Roth v. Perseus, 522 F.3d 242 (2d Cir. 2008) (No. 06-3771-cv) ("*Perseus* SEC Amicus Brief") (defending application of Rule 16b-3(d) to directors by deputization because "[t]here is no question that the deputized director who actually sits on the board owes the company fiduciary duties").

issuer-insider transactions exempted by the rule [may] in [some] circumstance[s] be susceptible to abuse of inside information. There could be a situation, for example, where a dominant insider is privy to inside information that he conceals from the board or shareholders in obtaining approval for a transaction.

*Perseus* SEC Amicus Brief at 18. Faced with the "possibility" that such transactions may be "susceptible to abuse of inside information," and no statutory exemption for beneficial owners, our inquiry ends. *See Steel Partners*, 315 F.3d at 131 (Jacobs, *J.*, dissenting) (noting that where the facts do not "preclude the possibility of abuse or manipulation," they do not "justify exemption from disgorgement") (citing *Blau*, 363 F.2d at 519). Therefore, since their purchases are not exempt from the statute's coverage, if the Funds are beneficial owners, they are liable for short-swing profits.

We turn now to that question. Under Section 16(b), "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" is liable for short-swing profits. 15 U.S.C. § 78p(a) and (b). And for the purposes of Section 16(b) disgorgement liability, a "beneficial owner" is any "person" who, directly or indirectly, has or shares (1) voting or investment power over and (2) a pecuniary interest in a security. 17 C.F.R. § 240.16a-1(a)(1)-(2); *id* § 240.13d-3(a)(1)-(2).[5] "Persons" include corporations, partnerships,

---

[5] As we explained in *Feder v. Frost*, 220 F.3d 29 (2d Cir. 2000):

Rule 16a-1(a)(1) . . . provides the definition of beneficial owner that "is used only to determine [insider] status as a ten percent holder." Exchange Act Release No. 34-28869, 56 Fed. Reg. at 7244 (using standards set forth in Section 13(d) of Exchange Act); *see also* [Ownership Reports and Trading by Officers, Directors and Principal Stockholders,] Exchange Act Release No. 34-26333, 53 Fed. Reg. [49997,] 50001 [(Dec. 13, 1998)] (explaining that analysis of beneficial owner for purposes of ascertaining who is ten-percent holder turns on person's potential for control so that proposed new rule relies on Section 13(d) for deciding who is ten-percent

associations, joint-stock companies, trusts, funds, or "any organized group of persons whether incorporated or not." 15 U.S.C. § 80a-2(a)(8).

The Funds argue that the limited partners' delegation of exclusive power to vote and dispose of the Funds' portfolio securities to their respective general partners, and ultimately to Marxe and Greenhouse, precludes the Funds, who possessed merely an economic interest in the WPCS's shares, from being ten percent holders under the SEC's rules. Appellants' Br. 24. Instead, according to the Funds, Marxe and Greenhouse – who actually controlled the securities held by PE and QP – were the only conceivable insiders with the ability to misuse inside information, and consequently they – but not the Funds – should be subject to the restrictions of Section 16(b). It is irrelevant, the Funds argue, that Marxe and Greenhouse exercised their exclusive voting and investment power on behalf of, and in the name of, QP and PE. *Id.* at 36.

The Funds' arguments are inventive, but cannot be squared with basic principles of agency law. Under Delaware law, a general partner of a limited partnership is "an agent of the partnership for the purpose of its business, purposes or activities." Del. Code Ann. tit. 6 § 15-301(a); *id.* § 17-403(a) (West 2011). Thus, an act of a general partner "for apparently carrying on the ordinary course of the partnership's business . . . binds the partnership." *Id.* § 15-301(a). Moreover, the general partner of a limited partnership has the authority "to delegate to 1 or more persons the general partner's rights and power to manage and control the business and affairs of

_____

holder). Once ten-percent status – or, of course, status as an officer or director – is determined, the definition of beneficial owner provided by Rule 16a-1(a)(2) comes into play for purposes of the reporting and short-swing profit provisions of Section 16.

*Id.* at 33-34.

12

the limited partnership, *including to delegate to agents . . . of the general partner or the limited partnership.*" *Id.* § 17-403(c) (emphasis added). Here, Marxe and Greenhouse served as agents of the Funds' respective general partners, who delegated to them their "rights and power" to exercise voting and investment control over the securities held by the Funds. Thus, their actions bound the partnerships. We agree that a limited partnership

> should be deemed the beneficial owner of its portfolio of securities for purposes of the ten percent owner calculation. The fact that only natural persons can make voting and investment decisions for the entity does not mean that the entity itself is not a beneficial owner. By the same token, attribution of beneficial ownership to the entity does not mean that the individuals who make voting or investment decisions on behalf of the entity are not also beneficial owners of the securities.

Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide* 134-35 (§ 2.03[5][f]) (3d ed. 2008).

The Funds' argument also ignores the fact that the definition of "person" in Section 16(b) includes "partnerships," and that under the Funds' logic, Rule 16a-1(a)(1) would exempt the vast majority of limited partnership investment vehicles from disgorgement liability under Section 16(b). Indeed, under the Funds' "delegation" theory of Section 16(b) liability, only the general partners' pecuniary share of any short-swing profits accruing to the partnership's investment portfolio would be subject to disgorgement, because only general partners hold investment and voting power over the securities held in the partnership's portfolio – despite the fact that, when exercising that power, they are acting on behalf of the partnership rather than themselves. We have little difficulty concluding that such a result would be inconsistent with the text and purposes of Section 16(b) and, if accepted, would seriously weaken the provision. For these reasons we hold that the Funds are beneficial owners for the purposes of determining ten

13

percent holder status under Section 16(b), that their April 2006 acquisition of stock from WPCS

constitutes a "purchase" within the meaning of that section, and that, consequently, they are

liable for the short-swing profits derived as a result of that purchase.

## CONCLUSION

The judgment of the district court is AFFIRMED.